JOHNSON *v.* LAPPO LUMBER COMPANY

1. Sales—Warranty—Fans—Motors.

Loss of plaintiff's hogs caused by failure of the motors on ventilating fans purchased and installed by plaintiff on his newly-constructed environmentally-controlled hog barn could not be charged to any actionable misconduct, neglect or breach of warranty on the part of defendants who furnished the fans, although the fans sold were not reasonably fit for the particular purpose for which they were required, where the plaintiff failed to supply correct information to defendant expert when it was requested by him, and that information was essential to the validity of his advice as to the type of fan motor to be used (CL 1948, § 440.15).

2. Appeal and Error—Findings of Fact.

On review of an action at law tried by a court without a jury, the Court of Appeals does not override findings of fact unless the record does not justify such findings and they are clearly erroneous (GCR 1963, 517.1, 810[2]).

Appeal from Muskegon, Albert J. Engel, J. Submitted Division 3 April 9, 1970, at Grand Rapids. (Docket No. 8,116.) Decided July 2, 1970.

Complaint by Caryl G. Johnson, Jr., against Lappo Lumber Company, Fitzpatrick Electric Supply Company, J. A. Goode Company, and Chelsea Fan and Blower Company for breach of implied warranty. Judgment for defendants. Plaintiff appeals. Affirmed.

---

References for Points in Headnotes

[1] 46 Am Jur, Sales §§ 348–350, 352.
[2] 5 Am Jur 2d, Appeal and Error § 839.

*James W. Bussard,* for plaintiff.

*Cholette, Perkins & Buchanan (Edward D. Wells,* of counsel), for Lappo Lumber Company.

*Landman, Hathaway, Latimer, Clink & Robb,* for Fitzpatrick Electric Supply Company.

*Poppen, Street & Sorensen,* for J. A. Goode Company.

Before: Holbrook, P. J., and Bronson and E. W. Brown,* JJ.

Per Curiam. After a careful study of the record and a consideration of the briefs and arguments, we deem it advisable to restate the carefully written opinion of Circuit Judge Albert J. Engel:

"This well-tried case was heard on December 9, 1965 by the Honorable Henry L. Beers, sitting without a jury. Prior to the time limited for the filing of final briefs, Judge Beers died, and, rather than re-try the case, all counsel agreed to submit the same to the undersigned upon the record made. The full transcript has now been received and carefully read, together with the additional briefs of the parties.

"Plaintiff Caryl G. Johnson, Jr. seeks damages for the loss of hogs caused by the failure of certain ventilating fans purchased and installed by him in his then newly constructed 'environmentally controlled' hog barn. He sues: Lappo Lumber Company as ultimate vendor of the fans; Fitzpatrick Electric Supply Company, through whom the purchase was channeled and who acted as intermediary in seeking expert advice; J. A. Goode Company, employer of a manufacturer's representative and dis-

_____
*Circuit judge, sitting on the Court of Appeals by assignment.

tributor; and Chelsea Fan and Blower Company, the manufacturer of the fans in the first place.

"Plaintiff commenced construction of the hog barn on February 7, 1963, and it was completed by June 27, 1963, the date on which the first hogs were moved in. A description of the structure itself, and its purpose is necessary to an understanding of the case and of the issues involved.

"The building was erected solely for the purpose of raising hogs and was a long structure, consisted of several rooms, in each of which were pens in which hogs of different ages and stages of growth were kept. The pens are built over a lagoon and the hogs are raised on slats with openings into the lagoon. The method of feeding the hogs is by running the feed through a trough. The feed is propelled continuously by means of an auger through the trough from one side of the building to the other. This trough contains a feed which is made up of finely granulated particles, much of which is about the consistency of talcum powder. The hogs feed continuously from this trough and apparently gain weight very rapidly. The building itself is completely enclosed with no windows or openings except openings around the ceiling or eaves to admit a considerable quantity of air.

"The testimony indicates that in order for hogs to survive under these conditions a constant supply of fresh air and an even temperature of around 55° are required and it was for the purpose of supplying this air and maintaining the temperature that plaintiff purchased the fans. The evidence is that after the fans had been installed, they commenced to fail periodically, which failures were brought to the attention of defendants or their agents. It is also not disputed that because of the fan failures a considerable number of hogs died, or through lack of sufficient oxygen became in such weakened condition that they were not marketable and were either a total loss to the plaintiff, or required much additional time, and hence cost, to bring to the proper weight.

"At the outset the plaintiff contacted the defendant Lappo Lumber Company, who had furnished the building materials for the building of the barn, relative to the purchase of fans, and was referred by Lappo to the Fitzpatrick Electric Company, a wholesaler of electrical appliances. The Fitzpatrick Electric Company in turn called the J. A. Goode Company, a wholesaler of fans, represented by Mr. Jenkins, who came to Muskegon and met with the respective parties to give advice as to the type and character of fans to be installed in plaintiff's building. The fans in turn were purchased from the Chelsea Fan and Blower Company.

"While Mr. Jenkins, on the trial of this case, does not claim he acted as an expert in this field, it is obvious from the proof in this case that he was considered by the plaintiff as an expert and by the other parties to this suit also. A meeting was held between the various representatives at which the operation of the hog barn was discussed and Mr. Jenkins advised the installation of certain fans which had been selected from a catalogue of the J. A. Goode Company. These fans were fans with motors which were termed upon the trial as 'open'. That is, the motor was not completely sealed off from the outside air. While there is some dispute in the testimony as to what information was given to Mr. Jenkins relative to the placement of the fans in the hog barn, the evidence preponderates in favor of the proposition that there was an entire failure to give Mr. Jenkins certain very vital information as to the operation of this hog barn in requesting him to render an opinion as to the type of fans to be used.

"The fact is that upon the installation of the fans in the barn, they were placed immediately over the end of the feed trough above described. The request made by plaintiff of Mr. Jenkins was that he should receive fans which would move 10,000 cubic feet of air per minute from the building, consequently drawing fresh air into the building, through the vents.

It is obvious from the testimony in this case that placing of these fans directly over the trough containing the powder-like substance caused the fans to pick up this powdery feed and draw it over the mechanism of the fan. The fact that the motors had openings in them of course caused the motors to become clogged with this fine dust so that they could not properly operate. Periodically, at least each thirty days, from the time of the installation of these fans, trouble was incurred with them because of the above, and about Christmas time of 1963, a considerable hog loss resulted.

"A second set of motors was installed which did not work completely satisfactorily and then a third set of motors. Upon the installation of motors which were completely enclosed so that they admitted no dust from feed, the plaintiff testifies that the operation then operated properly and he brings this action for damages as aforesaid for loss sustained by the failures of the first motors.

"The law of this case is governed by the provisions of the Uniform Sales Act, CL 1948, § 440.15 (Stat Ann 1959 Rev § 19.255), which provides in part as follows:

" 'Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

" '(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.

" '(2) Where the goods are bought by description from a seller who deals in goods of that description, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be of merchantable quality.'

"While the statute cited has now been replaced by the Uniform Commercial Code (See MCLA §§ 440.2314, 440.2315 [Stat Ann 1964 Rev §§ 19.2314, 19.2315]), still as applied to the facts in this case, there is no appreciable difference.

"Plaintiff claims that the fans were not of merchantable quality and further that there was a breach of the implied warranty that the fans were reasonably fit for the purpose for which they were required.

"Under the proofs in the case, the court finds that the fans supplied were, in and of themselves, of merchantable quality.

"Under the proofs in the case, the court finds that the fans sold were not, in fact, reasonably fit for the particular purpose for which they were required. This being so, did Mr. Johnson make known to the defendants or any of them the particular purpose for which they were required, and did he, in fact, rely upon the seller's skill and judgment? This is the heart of the issue in the case. Allowing for some variations and inconsistencies in the testimony of the witnesses, the evidence clearly shows that the plaintiff did make known, and did rely, but only in part. Employees of both Lappo and Fitzpatrick bypassed the question altogether, and Bernard B. Jenkins, the Manufacturer's representative employed by Goode, was called in. He was called in specifically to advise on the suitability of the fans which plaintiff proposed to buy for the purpose of ventilating the barn. Jenkins had considerable practical experience in the use of fans in agricultural and other buildings. The court finds that while Johnson had a right to rely upon Jenkins' conclusions, he had a corresponding duty, however, to supply the correct information to Jenkins when it was requested of him, and when that information was essential to the validity of the advice he sought. In this he failed. It was Mr. Johnson's testimony that Jenkins specifically inquired about the presence of unusual dust or moisture in the barn. The question

was directly for the purpose of determining whether
an open, closed, or 'explosion-proof' fan would be
required. Mr. Johnson specifically informed Mr.
Jenkins that the barn would be 'Not necessarily any
dustier than any other house, or home, or room or
anything.' He also told Jenkins that there would
be no moisture problem. While there is some evi-
dence to support plaintiff's claim that Jenkins had
a plan of the barn, and that the location of the
lagoon was indicated thereon, still the evidence pre-
ponderates that Johnson neither disclosed to Jen-
kins that the fans would be installed only inches
away from the feeder nor that the barn would be
directly over water and separated only by slats, and
that finely ground feed would be employed. Mr.
Johnson did disclose that the fans must each move
10,000 cublic feet of air per minute, but there is no
proof whatsoever that the fans furnished were in
any wise deficient in this requirement. It is en-
tirely clear from the proofs that Mr. Johnson did
not rely upon Mr. Jenkins' judgment as to the pres-
ence of dust and moisture in the barn, but rather up-
on his own judgment, and that in this respect Jen-
kins relied upon Johnson.

"The testimony of the veterinarian, and indeed of
Mr. Johnson, was that at the time, this particular
method of raising hogs was new and rather unique,
about which not a great deal was known. Conse-
quently, the only information which Jenkins could
have had upon which to base his judgment was that
which he obtained from the plaintiff and Johnson
had to be aware of this. It is manifestly clear from
all of the testimony that had Mr. Johnson supplied
the complete and correct information which Mr.
Jenkins requested, the latter would without question
have recommended closed-type fans with sealed mo-
tors and the unfortunate loss would never have oc-
curred.

"While anyone hearing or reading the testimony
in this case is bound to feel great sympathy for the
plight of Mr. Johnson, still his loss cannot be charged

to any actionable misconduct, neglect or breach of warranty on the part of the defendants.

"Judgment will be entered in favor of the defendants of no cause of action, with costs."

On review of an action at law tried by the court without a jury, this Court does not overrule findings of fact unless the record does not justify such findings and they are clearly erroneous. GCR 1963, 517.1 and 810(2); *Hughson* v. *O'Reilly* (1967), 7 Mich App 324; *King* v. *Partridge* (1968), 9 Mich App 540, 544. Our review of the record in the instant case reveals that the findings of fact by the trial court are fully supported by the evidence. We determine that the trial judge's opinion properly disposed of the case.

Affirmed. Costs to defendants.